***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Taylor and the briefs and oral arguments before the Full Commission. The parties have not shown good grounds to receive further evidence or to rehear the parties or their representatives. Upon reconsideration of the evidence, the Full *Page 2 
Commission affirms with minor modifications the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties before the hearing in a Pre-Trial Agreement and at the hearing as
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. An employment relationship existed between Garry Thompson and the employer at all times relevant to this claim.
3. This is a claim for an occupational disease of the lungs.
4. Garry Thompson's average weekly wage was sufficient to yield the maximum compensation rate for 1997.
5. The following exhibits were stipulated into evidence:
 a. Stipulated Exhibit 1: Garry Thompson's May 7, 2004 deposition;
 b. Stipulated Exhibit 2: Garry Thompson's death certificate;
 c. Stipulated Exhibit 3: Industrial Commission Orders;
 d. Stipulated Exhibit 4: Industrial Commission Forms;
 e. Stipulated Exhibit 5: Garry Thompson's medical records;
 f. Stipulated Exhibit 6: Plaintiff's discovery responses;
 g. Stipulated Exhibit 7: Defendants' discovery responses;
 h. Stipulated Exhibit 8: Garry Thompson's personnel file;
 i. Stipulated Exhibit 9: Plant medical records; *Page 3 
 j. Stipulated Exhibit 10: Industrial Hygiene Data; and
 k. Stipulated Exhibit 11: Material Safety Data Sheets.
 ***********
Based upon all the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. The decedent, Garry Thompson, was born on August 11, 1937. He was diagnosed with lung cancer in April 2003 and died as a result of his lung cancer on May 21, 2004. He began working for Kelly Springfield on August 30, 1976 as an hourly maintenance employee. Mr. Thompson went out of work on May 8, 1997 due to a back injury and did not return to work thereafter.
2. The Kelly Springfield plant where Mr. Thompson worked was built in 1962. Asbestos-containing insulation was used throughout the plant to insulate pipes, gaskets, steam lines and boilers. Asbestos cement was also used in elbows and pipe connections in the plant.
3. Mr. Thompson began his career at Kelly Springfield as an hourly maintenance employee and worked in that position for two years. As an hourly maintenance employee, he regularly worked on boilers, which involved ripping out old insulation on boilers and replacing it with new insulation. Boiler insulation contains friable asbestos. When he ripped old asbestos-containing insulation off the boilers, Mr. Thompson saw visible dust coming off the insulation into the air. When removing and replacing boiler insulation, Mr. Thompson was ripping out and replacing insulation for many hours straight usually working on four boilers at once.
4. The parties have retained the services of the following multi-credentialed doctors to render their opinions in this matter: *Page 4 
 • Dr. Allan Feingold, board-certified in internal medicine and pulmonology;
 • Dr. David S. Feigin, board-certified in medicine, radiology and B-reading;
 • Dr. Arthur Frank, board-certified in internal medicine and occupational medicine with a Ph.D. in biomedical sciences;
 • Dr. Steven Dikman, board-certified in anatomic pathology and in clinical pathology;
 • Dr. Henry Izurieta who is not board-certified.
 • Dr. James E. Lockey, board-certified in internal medicine, pulmonology and occupational medicine;
 • Dr. Frederick M. Dula, Jr., board-certified in B-reading; and
 • Dr. Andrew J. Ghio, board-certified in internal medicine, pulmonology and B-reading.
5. As a worker who was removing and replacing asbestos-containing insulation on a regular basis without respiratory protection, Mr. Thompson had a relatively high level of exposure to asbestos. According to Dr. Arthur Frank, an expert in the field of asbestos and asbestos-related lung disease who serves as Professor and Chair of the Department of Environmental and Occupational Health at the Drexel University School of Public Health and as a Professor of Medicine in the Pulmonary Division of the Drexel University College of Medicine, workers who handle insulation have some of the highest levels of exposure to asbestos among all workers.
6. In addition to ripping out asbestos-containing insulation on boilers, Mr. Thompson also had to remove and replace asbestos-containing insulation on steam lines, pipes and gaskets while working as an hourly *Page 5 
maintenance employee. All of this asbestos-containing insulation had to be molded, mixed or sawed in order to fit the surfaces on which it was placed. As an hourly maintenance employee, Mr. Thompson also came in contact with asbestos-containing cement when working on elbow and pipe connections.
7. Plaintiff rarely, if ever, wore respiratory protection while working as an hourly maintenance employee at Kelly Springfield.
8. Technically, once Mr. Thompson became a maintenance area manager, he was not supposed to perform maintenance jobs. However, a review of his plant medical records and personnel file shows that he continued to perform actual maintenance work throughout his entire career at Kelly Springfield.
9. As a maintenance area manager in Curing, Mr. Thompson trained and supervised the hourly maintenance workers in Curing. He also inspected their work. The hourly maintenance workers whom he supervised removed asbestos-containing insulation from the pipes and steam lines behind the curing presses. Those pipes and steam lines were in such a tight area that the maintenance workers could not use a glove-bag technique to remove the asbestos-containing insulation. Instead, they had to actually take it out and remove it by hand. Mr. Thompson personally supervised the removal of this asbestos-containing insulation from the pipes and steam lines behind the curing presses. Mr. Thompson did not wear any respiratory protection while supervising the workers who were removing asbestos-containing insulation from the pipes and steam lines behind the curing presses.
10. Bystanders who are not directly involved in handling asbestos-containing materials can develop asbestos-related diseases from their bystander exposure.
11. During Mr. Thompson's employment, large-scale asbestos removal was taking place in the areas where he worked. This asbestos removal was done by contract workers on Sundays. Mr. Thompson worked on Sundays while the asbestos removal was occurring. The contract workers wore protective gear that resembled a space suit during the asbestos removal. Mr. Thompson did not wear protective gear during the asbestos removal process. Sometimes, the *Page 6 
contract workers would remove asbestos-containing insulation from the pipes behind the curing presses. Mr. Thompson would supervise them and make sure they had everything they needed while they were performing the insulation removal.
12. Mr. Thompson was diagnosed with small cell lung cancer in April 2003, which was approximately 27 years after he came into direct contact with asbestos-containing insulation as an hourly maintenance worker at Kelly Springfield. Small cell lung cancer is associated with exposure to asbestos. The latency period for developing asbestos-related disease after exposure to asbestos ranges from ten years to 50 years or more following exposure.
13. Mr. Thompson's chest films revealed bilateral pleural plaques according to three B-Readers, Dr. Dula, Dr. Feigin and Dr. Feingold. The only B-Reader who did not see bilateral pleural plaques on Mr. Thompson's films was Dr. Ghio. Dr. Ghio saw pleural irregularities on Mr. Thompson's films, but testified that they did not meet the size criteria necessary for being labeled pleural plaques. In his report, however, he stated that Mr. Thompson had a pleural irregularity that was 5 millimeters in diameter, which meets the requisite size criteria.
14. Three out of four B-Readers saw bilateral pleural plaques on Mr. Thompson's films, and Dr. Ghio admitted in his report to seeing a pleural irregularity that meets the size criteria for being labeled pleural plaques. Mr. Thompson had bilateral pleural plaques.
15. Pleural plaques show substantial and significant exposure to asbestos fibers. They are a fibrotic response to a fiber exposure. Pleural plaques are not associated with cigarette smoking. *Page 7 
16. Three of the experts who testified in this case, Dr. Frank, Dr. Dikman, and Dr. Lockey, believe that a finding of pleural plaques is sufficient to attribute lung cancer to asbestos exposure. Two of the experts who testified, Dr. Feingold and Dr. Ghio, believe that a finding of asbestosis is required to attribute lung cancer to asbestos exposure.
17. Pleural plaques are sufficient to attribute lung cancer to asbestos exposure.
18. Asbestos, by itself, can produce lung cancer because it is a carcinogen. Additionally, there is a special relationship between asbestos, cigarette smoking and the development of lung cancer, which is known as synergy. The combination of cigarette smoking and asbestos exposure produces more lung cancer than either cigarette smoking or asbestos exposure alone. When synergy between cigarette smoking and asbestos exposure is at play in a lung cancer case, there is no way to apportion between the role of the cigarette smoking versus the role of the asbestos exposure.
19. Defendants retained the services of Mr. Joseph Holthouser, an industrial hygienist, to render an opinion as to whether Mr. Thompson's workplace exposure to asbestos at Kelly Springfield placed him at an increased risk for developing lung cancer. In doing so, Mr. Holthouser created an estimate of Mr. Thompson's workplace exposure to asbestos during his career at Kelly Springfield. However, Mr. Holthouser's estimate did not include any information about the levels of Mr. Thompson's asbestos exposures from August 30, 1976 until November 30, 1987. This is significant as Mr. Thompson worked as an hourly maintenance worker in 1976 and 1977, and he was directly exposed to asbestos-containing insulation on a regular basis during that period of time. Mr. Holthouser's estimate also assumed that Mr. Thompson stood approximately 10 feet away from the hourly maintenance workers he supervised while they were *Page 8 
handling asbestos-containing insulation. This assumption is not supported by the greater weight of the evidence.
20. Mr. Holthouser's exposure estimate is an unreliable estimate of Mr. Thompson's workplace exposure to asbestos at Kelly Springfield. Based on his estimate of Mr. Thompson's workplace asbestos exposure, Mr. Holthouser was of the opinion that Mr. Thompson's job at Kelly Springfield did not place him at an increased risk for developing lung cancer as compared with the public generally. Because Mr. Holthouser's increased risk opinion is premised on his unreliable exposure estimate, however, the Full Commission gives little weight to this opinion.
21. Defendants also retained the services of Dr. James Lockey, an occupational medicine physician, to render opinions in this case. Dr. Lockey was of the opinion that Mr. Thompson's workplace exposure to asbestos at Kelly Springfield did not place him at an increased risk for developing lung cancer. Dr. Lockey's opinion on increased risk is based on his assumption that Mr. Thompson's workplace exposure to asbestos at Kelly Springfield was very low. Dr. Lockey's assumption that Mr. Thompson's workplace asbestos exposure was very low is based, at least in part, on Mr. Holthouser's unreliable asbestos exposure estimate. Dr. Lockey's assumption that Mr. Thompson's workplace exposure to asbestos was very low is not reflective of Mr. Thompson's actual exposure.
22. As an hourly maintenance worker, Mr. Thompson was directly exposed to asbestos-containing insulation on a regular basis while not wearing adequate respiratory protection. Mr. Thompson continued to perform actual maintenance work after becoming a maintenance area manager, which continued to give him some direct exposure and he was exposed to asbestos-containing insulation as a bystander when he was a maintenance area manager. He did not wear respiratory protection while working as a maintenance area manager. *Page 9 
23. As Dr. Lockey's increased risk opinion is premised on his assumption that Mr. Thompson's workplace exposure to asbestos was very low, the Full Commission gives little weight to the increased risk opinion of Dr. Lockey.
24. Plaintiff retained the services of Dr. Steven Dikman and Dr. Arthur Frank to render opinions as to the cause of Mr. Thompson's lung cancer and the relationship, if any, between his workplace exposure to asbestos at Kelly Springfield and the development of his lung cancer. Dr. Dikman is a professor and board-certified physician at the Mount Sinai School of Medicine who has been studying and working in the field of asbestos-related diseases since 1969, when he met Dr. Irving Selikoff, who was one of the leading experts on asbestos and asbestos-related disease. In addition to teaching, Dr. Dikman has an active clinical practice and also engages in original research with publications in peer-reviewed literature. Dr. Frank, whose credentials have been discussed above, has been engaged in asbestos-related work for almost 40 years and is board-certified in internal medicine and occupational medicine.
25. Dr. Dikman was of the opinion, to a reasonable degree of medical certainty, that Mr. Thompson's workplace exposure to asbestos at Kelly Springfield placed him at an increased risk for developing lung cancer as compared with members of the general public not equally exposed. Dr. Dikman's opinion is based upon his review of the evidence of record regarding Mr. Thompson's workplace exposure to asbestos and cigarette smoking history and Mr. Thompson's medical records.
26. Dr. Frank was of the opinion that a worker who is exposed to asbestos is absolutely, without question, at a greater risk of developing lung cancer than the public generally.
27. Both Dr. Dikman and Dr. Frank were of the opinion to a reasonable degree of medical certainty that Mr. Thompson's workplace exposure to asbestos at Kelly Springfield made *Page 10 
a significant contribution to the development of his lung cancer. Dr. Dikman and Dr. Frank believe that Mr. Thompson's cigarette smoking also was a significant causal factor in the development of his lung cancer. The causation opinions of Dr. Dikman and Dr. Frank are based upon their review of the evidence of record regarding Mr. Thompson's workplace exposures and cigarette smoking history, as well as their review of his medical records and their extensive training and experience as clinicians and researchers in the field of asbestos-related lung diseases. The Full Commission gives greater weight to the opinions of Dr. Dikman and Dr. Frank on increased risk and causation with respect to Mr. Thompson's lung cancer.
28. Defendants retained Dr. James Lockey and Dr. Allan Feingold to render opinions as to the cause of Mr. Thompson's lung cancer. Both Dr. Lockey and Dr. Feingold were of the opinion that plaintiff's lung cancer was not related to his employment at Kelly Springfield. The causation opinions of Dr. Lockey and Dr. Feingold are based, in part, on Mr. Holthouser's exposure estimate of Mr. Thompson's workplace exposure to asbestos at Kelly Springfield. The causation opinion of Dr. Lockey also is based on the fact that Mr. Thompson had numerous other non-work-related risk factors for the development of lung cancer. Dr. Feingold testified that small cell lung cancer is virtually always related to cigarette smoking.
29. The Full Commission gives less weight to the opinions of Drs. Lockey and Feingold.
30. Mr. Thompson's (hereinafter, Decedent) employment at Kelly Springfield made a significant contribution to the development of his lung cancer.
31. Decedent's employment at Kelly Springfield (during which he initially worked as an hourly maintenance worker who was directly exposed to asbestos-containing insulation on a regular basis and later worked as a maintenance area manager who was exposed, at least as a *Page 11 
bystander, to asbestos-containing insulation) placed him at an increased risk for developing asbestos-related lung cancer as compared with members of the general public not equally exposed.
32. The last employment in which Decedent was placed at an increased risk for developing lung cancer and which significantly contributed to the development of his lung cancer was his employment at Kelly Springfield.
33. Decedent was last injuriously exposed to the hazards of asbestos at Kelly Springfield.
34. Decedent died as a result of his asbestos-related lung cancer on May 21, 2004.
35. At the time of his death, Decedent was married to Alice Faye Thompson.
36. At the time of Decedent's death, Alice Faye Thompson was 61 years old. Mrs. Thompson claims she was no longer physically able to work or support herself due to back problems and arthritis at that time.
37. Mrs. Thompson went out of work on March 2, 2004 on FMLA to care for Decedent.
38. Beginning on March 2, 2004, Alice Faye Thompson had to assist Decedent with all of his daily activities, including bathing, feeding, and going to the bathroom. She also had to change Decedent's diapers when he became incontinent and had to get up with him in the middle of the night. During the day, she had to keep an eye on him constantly because he would try to get up on his own, and, if he did, he would fall.
39. Alice Faye Thompson claims she rendered sixteen hours of attendant care services to Decedent per day from March 2, 2004 until his death on May 21, 2004, which was a period of 83 days and claims 1,328 hours of attendant care services. *Page 12 
40. Decedent suffered a significant one-the-job injury to his low back and neck in 1996 and received workers' compensation benefits from 1996 to at least February 2004, when he entered into a Compromise Settlement Agreement, settling his claim.
41. Mrs. Thompson acknowledged that Decedent's back injury created ongoing problems with his legs and hands such that "he couldn't hardly use his legs." The greater weight of the competent evidence does not show that any care Mrs. Thompson provided Decedent between March 2, 2004 and May 21, 2004 was directly and causally related to Decedent's cancer rather than any ongoing problems related to his back injury. Thus, Mrs. Thompson has failed to establish by the greater weight of the evidence that attendant care was necessary due to Decedent's occupational disease.
42. Mrs. Thompson has failed to establish by the greater weight of the evidence that she was unable to support herself at the time of Decedent's death.
 ***********
The foregoing stipulations and findings of fact engender the following additional
 CONCLUSIONS OF LAW
1. As a result of his employment at Kelly Springfield, Decedent developed asbestos-related lung cancer, which qualifies as a compensable occupational disease. Decedent's work at Kelly Springfield placed him at an increased risk for developing lung cancer as compared with the public generally and his work at Kelly Springfield made a significant contribution to the development of his lung cancer. N.C. Gen. Stat. §97-53(13); Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983).
2. Decedent's last injurious exposure to asbestos was during his employment at Kelly Springfield. Hayes v. Felspar Products, Co.,222 N.C. 163, 166, 22 S.E.2d 275, 277 (1942). *Page 13 
3. Decedent's average weekly wage was sufficient to yield the maximum compensation rate for 2004, $688.00 per week. N.C. Gen. Stat. §§ 97-29;97-38.
4. Alice Faye Thompson has failed to prove by the greater weight that she is entitled to death benefits beyond 400 weeks due to her own disability pursuant to N.C. Gen. Stat. § 97-38.
5. Although she did provide attendant care to Decedent, Mrs. Thompson has failed to present sufficient evidence from which the Full Commission can make a determination on what amount of compensation, if any, should be paid for attendant care.
 ***********
The foregoing stipulations, findings of fact and conclusions of law engender the following
 AWARD
1. Subject to a reasonable attorney's fee herein approved, Defendants shall pay to Alice Faye Thompson death benefits in the amount of $688.00 per week beginning on May 21, 2004 for a period of 400 weeks. Portions of this compensation have accrued and shall be paid in a lump sum.
2. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded to plaintiff in Paragraph 1 above is hereby approved and shall be deducted by Defendants from the amounts due Plaintiff and paid directly to Plaintiff's counsel.
3. Defendants shall pay the costs.
This the 8th day of January 2009.
S/___________________ BUCK LATTIMORE COMMISSIONER *Page 14 
CONCURRING:
 S/___________________ DIANNE C. SELLERS COMMISSIONER
DISSENTING IN PART:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER *Page 15